

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x

JORGE DONALDO PACHECO BENAVENTE,

                                        Petitioner,

           -against-

THOMAS DECKER, *in his official capacity as Director of the New York Field Office of U.S. Immigration & Customs Enforcement*; CHAD WOLF, *in his official capacity as Acting Secretary, U.S. Department of Homeland Security*; CARL E. DUBOIS, *in his official capacity as Sheriff of Orange County, New York*,

                                        Respondents.

------------------------------------- x

MEMORANDUM DECISION
AND ORDER

20 Civ. 2968 (GBD)

GEORGE B. DANIELS, United States District Judge:

      Petitioner Jorge Donaldo Pacheco Benavente seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2241, challenging the lawfulness of his ongoing detention by Immigration and Customs Enforcement ("ICE"). (*See* Pet. for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2241 ("Pet."), ECF No. 1.) Petitioner challenges his detention as a violation of (1) the Administrative Procedure Act ("APA"), (2) the Trafficking Victims Protection Reauthorization Act ("TVPRA"), and (3) the Due Process Clause of the United States Constitution. (*Id.* ¶¶ 102–23.)

      On April 20, 2020, Petitioner moved for a preliminary injunction and temporary restraining order ("TRO") ordering Respondents to release him on his own recognizance, and enjoining Respondents from arresting him during the pendency of his immigration proceedings. (Pet'r's Mot. for Order to Show Cause and Prelim. Inj. and TRO ("Mot. for PI and TRO"), ECF No. 3, at 1.) Alternatively, Petitioner requested a bail hearing before this Court "where Respondents must prove, by clear and convincing evidence, that [Petitioner's] ongoing detention is necessary and does not violate due process." (*Id.* at 2) Moreover, should this Court deny that requested relief, Petitioner

seeks alternative relief under *Mapp v. Reno*, 241 F.3d 221 (2d Cir. 2001), and asks this Court to "grant him release pending the adjudication of this petition because of the extraordinary circumstances presented by the COVID-19 pandemic." (Pet. ¶ 8 n. 1.) Petitioner's motion for a preliminary injunction and TRO is DENIED. Petitioner's request for relief pursuant to *Mapp v. Reno* is DENIED.

## I. FACTUAL BACKGROUND

Petitioner entered the United States "without any documents to legally enter, reside, or be lawfully employed in the United States." (Resp'ts' Mem. of Law in Opp'n to Mot. for Prelim. Inj. and TRO ("Mem. in Opp'n"), ECF No. 8 at 4.) On February 1, 2020, Petitioner was served with a Notice to Appear which charged him as removable pursuant to the Immigration and Nationality Act. (*Id.*) The following day, Petitioner was transferred and placed in the custody of the Office of Refugee Resettlement ("ORR"). (*Id.*) After his 18th birthday, Petitioner "aged out" of ORR and was transferred to ICE for a custody determination. (*Id.* at 5.) Although Petitioner's maternal aunt was identified as a potential sponsor for Petitioner, ICE deemed Petitioner's placement with his aunt "insufficient to mitigate the dangers to community and dangers to self . . . posed by Petitioner." (*Id.* at 4–5.) ICE ultimately "considered Petitioner's danger to self, danger to community, and flight risk" and upon its review of various factors,[1] deemed Petitioner "a danger to himself and the community and placed him in ICE custody." (*Id.* at 5.) Petitioner has been in ICE custody at the Orange County Correctional Facility ("OCJ") in Orange County, New York since March 18, 2020. (Pet. ¶ 9.)

---

[1] In their brief, Respondents list factors including details regarding Petitioner's testing positive for drugs while in ORR custody, Petitioner's self-reports of drug use while he was in his home country, and evidence of Petitioner's gang involvement. (*Id.* at 5.)

2

One week prior to his detention, the World Health Organization declared a global pandemic in light of COVID-19. (Pet. ¶ 27.) Petitioner states that at the time he filed his petition, "the [Orange County] government confirmed that 5,598 people have been infected and 171 people have died," adding that it is "essentially impossible" for individuals detained in OCJ to follow the procedures that the Orange County Health Commissioner suggested to prevent further spread of COVID-19. (*Id.* ¶ 37.) More specifically, Petitioner asserts that detainees of OCJ "do not have access to hand sanitizer or gloves and limited access to soap," share objects and appliances, but "those objects are not cleaned or disinfected between uses," and "are not provided with disinfectant wipes." (*Id.* ¶ 55.) He further claims that it is "impossible" for him to protect himself from contracting COVID-19 because he is unable to "regularly wash[] his hands with soap, separat[e] himself from other individuals, and avoid[] touching surfaces that others have touched." (*Id.* ¶ 48.) According to Petitioner, upon his arrival at OCJ, he was placed in isolation "apparently due to" the worldwide COVID-19 pandemic. (*Id.* ¶ 70.) Petitioner argues that because he suffers from chronic gastritis, he is at a heightened risk of suffering from severe medical complications if he contracts COVID-19. (*Id.* ¶ 75.)

According to Respondents, however, "there are no detainees or inmates at [OCJ] who have tested positive for COVID-19 or who are exhibiting potential COVID-19 symptoms." (Mem. in Opp'n at 2.) According to Respondents, only one OCJ guard tested positive, but the guard "had not had contact with ICE detainees at [OCJ]." (*Id.*) Moreover, they state that "both ICE and [OCJ] have been taking serious measures to prevent the spread of COVID-19 at that facility and to ensure the safety of those in their care." (*Id.*)

## II. LEGAL STANDARD

"[A] preliminary injunction is 'an extraordinary remedy never awarded as of right.'" *Benisek v. Lamone*, 138 S. Ct. 1942, 1943 (2018) (per curiam) (citation omitted). To obtain a preliminary injunction, the moving party must establish "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[2] *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Additionally, where the proposed injunction "will alter rather than maintain the status quo the movant must show clear or substantial likelihood of success." *Wright*, 230 F.3d at 547 (citation omitted). "The standard[s] for granting a [TRO] and a preliminary injunction pursuant to Rule 65 of the Federal Rules of [Civil] Procedure are identical." *Spencer Trask Software & Info. Servs., LLC v. RPost Int'l Ltd.*, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002); *see also Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008) ("It is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction.").

## III. PETITIONER HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS OF HIS APA OR HIS TVPRA CLAIM

Petitioner argues that Respondents violated the TVPRA by failing to "consider placement in the least restrictive setting available." (Mot. for PI and TRO at 12–15.) Petitioner adds that this also

---

[2] Petitioner argues that a preliminary injunction is also appropriate where petitioner demonstrates "irreparable harm and . . . 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" (Mot. for PI and TRO at 3 (citation omitted).) The Second Circuit has held that district courts may grant preliminary injunctions under the likelihood-of-success standard or the fair-ground-for-litigation standard. *See Wright v. Guiliani*, 230 F.3d 543, 547 (2d Cir. 2000). However, where "the moving party seeks a preliminary injunction that will affect 'government action taken in the public interest pursuant to a statutory or regulatory scheme, the injunction should be granted only if the moving party meets the more rigorous likelihood-of-success standard.'" *Id.* (citing *Beal v. Stern*, 184 F.3d 117, 122 (2d Cir. 1999)). Here, ICE is detaining Petitioner pursuant to a specific statute, 8 U.S.C. § 1226(a), under which Congress explicitly granted discretionary authority to detain individuals pending removal proceedings. Accordingly, Petitioner must meet the likelihood-of-success standard for a preliminary injunction.

violates the APA, because Respondents' alleged failure to consider potential placement with Petitioner's aunt was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." (Pet. ¶ 110 (citation omitted).)

Petitioner fails to recognize in his moving papers that Respondents did in fact consider his potential placement with his aunt—that is, what Petitioner appears to consider the "least restrictive setting available." (*See* Mot. for PI and TRO at 14.) Indeed, Respondents submit Petitioner's Form I-213, (Decl. of Supervisory Detention and Deportation Officer Linda Hyde, Ex. B (Form I-213, Record of Deportable/Inadmissible Alien, with Addendum, ECF No. 11-2)), wherein a Customs and Border Patrol Officer includes an entry dated March 18, 2020—more than three weeks prior to Petitioner's filing of his petition—which specifically outlined information ICE had gathered regarding Petitioner's alleged criminal history. Indeed, the entry states:

> In implementing ICE obligations under the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 . . . , as modified by the Violence Against Women Reauthorization Act of 2013 . . . , and specifically 8 U.S.C. § 1232(c)(2)(B), placement in the least restrictive setting was considered. Based on the aforementioned histories, [Petitioner] is a danger to himself, a danger to the community, and a significant flight risk. Thus, placement in ICE custody is the most appropriate setting for [Petitioner].

(*Id.*) Moreover, the entry lists Petitioner's address as his aunt's residence, indicating that Respondents were aware that Petitioner's aunt was a possible sponsor. (*Id.*) Petitioner therefore has not demonstrated that Respondents failed to consider his aunt as a sponsor, and his argument under the TVPRA fails.

Second, as Respondents correctly note, courts typically defer to an agency when reviewing determinations under the "arbitrary and capricious" standard. (*See* Mem. in Opp'n at 12–16.) Indeed, courts will consider whether the agency acted "within the bounds of reasoned decisionmaking [sic]." (*Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105 (1983); *see also* Mem. in

Opp'n at 13.) Here, there is no indication that Respondents did not follow the requirements of the TVPRA, nor was it beyond the bounds of reasoned decision-making for Respondents to determine that detention at OCJ was the most appropriate option for Petitioner, in light of his immigration status and criminal history. Petitioner has therefore not demonstrated a likelihood of success on his TVPRA or APA claims.

### IV. PETITIONER HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS OF HIS DUE PROCESS CLAIM

The Eighth Amendment requires that the government provide for the basic needs of incarcerated individuals, including food, clothing, shelter, medical care, and reasonable safety. *See DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). Though the Due Process Clause of the Fifth Amendment, rather than the Eighth Amendment, governs the treatment of federal civil detainees, the Supreme Court has extended the protections under the Eighth Amendment to civil detainees, reasoning that "persons in civil detention deserve at least as much protection as those who are criminally incarcerated." *Charles v. Orange Cty.*, 925 F.3d 73, 82 (2d Cir. 2019) (citing *Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982); *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). To establish a substantive due process violation regarding conditions of confinement, a petitioner must demonstrate that the challenged conditions pose an unreasonable risk of serious damage to the petitioner's health and the government acted with deliberate indifference to the challenged conditions. *See Charles*, 925 F.3d at 85–86; *Darnell v. Pineiro*, 849 F.3d 17, 29–30 (2d Cir. 2017).

Petitioner asserts that Respondents have acted with deliberate indifference to Petitioner's serious medical needs. In *Charles*, the Second Circuit delineated particular requirements for substantive due process claims alleging inadequate medical care. The detainee must establish "a serious medical need" and that the government "acted with deliberate indifference to such needs."

*Charles*, 925 F.3d at 86. Deliberate indifference requires proving that the government "*knew* that failing to provide the complained of medical treatment would pose a substantial risk to [a petitioner's] health or that the [government] *should have known* that failing to provide the omitted medical treatment would pose a substantial risk to [the petitioner's] health." *Id.* at 87. Here, Petitioner contends that he is at a high risk of contracting COVID-19 due to his underlying medical conditions, and that Respondents have not taken specific measures to mitigate his risk. Specifically, Petitioner argues, *inter alia*, that OCJ has not undertaken appropriate sanitation measures required to fully disinfect the jail, nor has it provided detainees with adequate sanitation supplies or personal protective equipment. (Mot. for PI and TRO at 18–19.)

Petitioner has not met his burden on this claim. As Respondents argue, "the government is making deliberate, ongoing efforts to address the medical needs of Petitioner and other detained individuals." (Mem. in Opp'n at 16.) Respondents contend that in light of the COVID-19 outbreak, all ICE detainees are housed separately from county inmates, and that during intake, all county inmates are given medical screenings, including a fever and respiratory illness assessment. (Resp'ts' May 27, 2020 Letter, Ex. A (Decl. of Colonel Anthony Mele), ECF No. 19-1, at ¶¶ 5, 9(b).) Additionally, inmates are asked a series of questions relating to any possible contact with individuals who may have contracted COVID-19. (*Id.* ¶ 9(b).) Any inmate who presents symptoms associated with COVID-19 is isolated for testing and treatment by medical staff. (*Id.*) Moreover, any detainee who may have been exposed to a confirmed case of COVID-19 will be "cohorted," *i.e.*, placed in a separate housing unit, for a period of 14 days. (*Id.* ¶ 9(j).)

Respondents assert that they maintain testing kits on hand and consult the Department of Health prior to all testing. (*Id.* ¶ 9(b).) Additionally, all detainees are issued two reusable face masks, which they are required to wear and clean daily. (*Id.* ¶ 9(f).) Meals are provided in cells, and

detainees are permitted outside of their cells, subject to social distancing procedures and regulations that OCJ has implemented. (*Id.* ¶ 9(g).) Respondents also assert that detainees are placed in individual cells, which provides "ample room for social distancing." (*Id.* ¶ 9(g).)

OCJ has also instituted numerous measures throughout the facility to prevent the spread of COVID-19, including but not limited to: educating staff and detainees on the importance of hand washing and other best practices; conducting medical screenings of all staff and vendors entering the facility; ensuring adequate personal protective equipment for staff; sanitizing each housing unit at least three times per day; and providing disinfectant spray, bleach, hand sanitizer, hot water, and soap in every housing unit, which are available to all detainees; (*Id.* ¶ 9(l).) Additionally, Respondents claim that OCJ's medical staff "immediately evaluate[s] any detainees and inmates who complain of illness." (*Id.* ¶ 9(h).)

Petitioner disputes whether OCJ has actually implemented the actions that Respondents claim to have taken to combat the spread of COVID-19. For example, Petitioner asserts that social distancing protocols cannot be implemented due to the "small shared recreational spaces where detainees continue to freely comingle." (Pet'r's June 2, 2020 Letter, ECF No. 21.) Petitioner further argues that "[t]he screening procedure of new detainees and inmates is clearly insufficient because only symptomatic individuals are placed in quarantine, leaving asymptomatic individuals to be integrated into the general population." (*Id.*)

Petitioner states that "Respondents are aware that failing to adequately protect [Petitioner] will likely have tragic results and yet have not taken necessary or appropriate precautions." (Pet. ¶ 123.) While Respondents appear to be aware of Petitioner's underlying medical condition—gastritis—they do not consider him to be a high-risk detainee. (*See* Mem. in Opp'n at 18.) Respondents identify high-risk detainees based on guidance from the CDC that delineates specific

criteria for people who are at higher risk for severe illness from COVID-19. *See* Centers for Disease Control and Prevention, *Coronavirus Disease 2019 (COVID-19) – People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited July 1, 2020). As Respondents point out, the CDC's guidance does not cover gastritis, and "[t]his, combined with the lack of any allegation of direct exposure to [COVID-19], counsels rejection of [Petitioner's] application for immediate release." (Mem. in Opp'n at 18.) Although Petitioner's underlying conditions may place him at increased risk of developing a serious case of COVID-19, Respondents' decision to classify detainees as high risk according to CDC criteria based on currently available information and clinical expertise was reasonable. Accordingly, Petitioner is unlikely to successfully prove that Respondents knew or should have known that not applying additional safety protocols to Petitioner would pose a substantial risk to his health.

Because Petitioner is unable to demonstrate that he is likely to succeed on the merits, he has not met his burden for a preliminary injunction or TRO, and this Court need not reach the other three factors to be examined for preliminary relief—*i.e.*, irreparable harm, the balance of the equities, and the public interest.

### V. PETITIONER HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS OF HIS *MAPP V. RENO* CLAIM

Petitioner argues that in the alternative to preliminary injunctive relief, he is entitled to relief in the form of immediate release pursuant to *Mapp v. Reno*. "[F]ederal courts have inherent authority to admit to bail individuals properly within their jurisdiction." *Mapp*, 241 F.3d at 226. This power "is a limited one, to be exercised in special cases only." *Id.* To succeed on a claim under *Mapp*, "[t]he petitioner must demonstrate that the habeas petition raise[s] substantial claims and that extraordinary circumstances exist[ ] that make the grant of bail necessary to make the habeas remedy

9

effective." *Id.* (second alteration in original) (quoting *Grune v. Coughlin*, 913 F.2d 41, 44 (2d Cir. 1990)). For the reasons described above in connection with the motion for injunctive relief, Petitioner has not raised substantial claims that indicate a likelihood of success. Therefore, Petitioner is not entitled to *Mapp* relief on his claims.

## VI. CONCLUSION

Petitioner's motion for issuance of a preliminary injunction and TRO, (ECF No. 3), is DENIED. Petitioner's request for a bail hearing is also DENIED.

Dated: New York, New York
July 21, 2020

SO ORDERED.

GEORGE B. DANIELS
United States District Judge